IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

W.T. DAVIS, INDIVIDUALLY; AARON
GORDON AND CARLTON R. BERRY ON
BEHALF OF A CLASS OF TAXPAYERS
OF GARLAND COUNTY, ARKANSAS,
SIMILARLY SITUATED; AND THE
GARLAND COUNTY CHAPTER OF
THE N.A.A.C.P.                                                                    PLAINTIFFS

v.                                        Case No. 6:89-cv-06088

HOT SPRINGS SCHOOL DISTRICT;
STATE OF ARKANSAS; ARKANSAS
STATE BOARD OF EDUCATION; CUTTER
MORNING STAR SCHOOL DISTRICT;
FOUNTAIN LAKE SCHOOL DISTRICT;
JESSIEVILLE SCHOOL DISTRICT;
LAKE HAMILTON SCHOOL DISTRICT;
LAKESIDE SCHOOL DISTRICT;
MOUNTAIN PINE SCHOOL DISTRICT                              DEFENDANTS

## ORDER

Before the Court is Defendants Cutter Morning Star School District, Fountain Lake School District, Hot Springs School District, Jessieville School District, Lake Hamilton School District, Lakeside School District, and Mountain Pine School District's (the "Districts") Motion for Relief from Settlement Agreement. ECF No. 208. The Districts move under Federal Rule of Civil Procedure 60(b)(5) to be released from their obligations under a settlement agreement that the Court adopted as a consent decree in 1992, and thus be declared unitary. ECF No. 208. Plaintiffs responded. ECF No. 217. The Districts replied. ECF No. 220. Separate Defendants State of Arkansas and State Board of Education have not responded to the Districts' motion, and the time to do so has passed. *See* Local Rule 7.2.

On February 26, 2024, the Court held a hearing (the "Hearing") to allow the parties to further present their arguments.  The Court finds the matter ripe for consideration.  For the reasons discussed below, the Court finds that the Districts' Motion for Relief from Settlement Agreement (ECF No. 208) and request for unitary status should be granted.

## I. BACKGROUND

On August 18, 1989, Plaintiffs filed this action seeking consolidation of the Districts based on the theory that having separate school districts perpetuated a history of segregation dating back to when Garland County maintained separate schools for black and white children.  ECF No. 1. On November 25, 1991, the parties entered into the Garland County School Desegregation Case Comprehensive Settlement Agreement (the "Settlement Agreement").  ECF No. 74; ECF No. 208-8.  Following a fairness hearing held on March 30, 1992, the Court entered an order (the "1992 Order") approving the Settlement Agreement and dismissing the case with prejudice.  ECF No. 82. The Settlement Agreement, in summation, required the Districts and the State of Arkansas to: (1) implement the Arkansas School Choice Act of 1989 (the "School Choice Act of 1989"), Ark. Code Ann. § 6-18-206 (repealed 2013); (2) create the Garland County Education Consortium; (3) provide staff development training programs; (4) provide curriculum development; (5) monitor testing and assessment; (6) provide Special Education and Gifted and Talented Education programs; (7) provide student/teacher interaction programs; (8) fund one school representative to attend the Annual Institute for Special Education Law; (9) assist in applying for various grant programs; (10) submit to monitoring by the Arkansas Department of Education; and (11) participate in the Garland County Education Consortium's Annual Meeting.  *See* ECF No. 208-8.

In a separate lawsuit in 2012, the Court found the School Choice Act of 1989 to be unconstitutional because it contained race-based restrictions in violation of the Equal Protection

Clause of the Fourteenth Amendment. *See Teague ex rel. T.T. v. Arkansas Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012), *vacated sub nom. Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013). The Eighth Circuit vacated that ruling as moot because the Arkansas legislature repealed the School Choice Act of 1989 in the interim and replaced it with the Arkansas Public School Choice Act of 2013 (the "2013 School Choice Act"), Ark. Code Ann. §§ 6–18–1901 *et seq.*[1]  On May 22, 2013, six of the Districts—excluding Hot Springs School District—filed a petition for declaratory relief, seeking clarity of the validity and application of the Settlement Agreement in light of the change in law.  ECF No. 161.  On June 10, 2013, the Court granted that petition and ruled that the Settlement Agreement is "a consent desegregation plan of the Court applicable to all public school districts within Garland County, Arkansas, for the purpose of remedying the vestiges of prior de jure racial segregation within the public education system of that county" and that it "should remain in effect despite recent changes to the law on which the Settlement Agreement was partly based."  ECF No. 168, p. 4-5.

On August 25, 2014, the same six Districts, again excluding Hot Springs School District, filed a Motion for Relief from Judgment.  ECF No. 174.  The six Districts sought termination of the Settlement Agreement and relief from the Court's 1992 Order in its entirety, arguing that it was no longer just or equitable to continue the application of the Settlement Agreement or the 1992 Order in light of the repeal of the School Choice Act of 1989.  *Id.*  Hot Springs School District and

---

[1] The 2013 School Choice Act removed the race-based limitations on public school choice transfers and included a provision that the receiving district shall not discriminate on the basis of, *inter alia*, race.  *See* Ark. Code Ann. § 6–18–1901 *et seq*.  However, the 2013 School Choice Act also included a carve-out restriction only permitting nonresident transfers "provided that the transfer by the student does not conflict with an enforceable judicial decree or court order remedying the effects of past racial segregation in the school district."  Ark. Code Ann. § 6–18–1901(b)(3).  In 2015, the Arkansas legislature amended the 2013 School Choice Act, placing additional requirements on school districts that were subject to desegregation orders and seeking exemption under the carve-out restriction. *See* Ark. Code. Ann. § 6-18-1906 (2015).  In 2017, the Arkansas legislature again amended its school choice act requiring a school district seeking exemption from participating in school choice to submit proof of a desegregation order "that explicitly limits the transfer of students between school districts."  Ark. Code. Ann. § 6-18-1906(a)(2) (2017).

Plaintiffs opposed that motion.  ECF Nos. 178, 183.  On March 31, 2015, following a hearing, the Court denied that motion and found that termination of the Settlement Agreement and relief from the 1992 Order was not warranted because the six petitioning districts had "not submitted any evidence to demonstrate full compliance with the [Settlement] Agreement, nor ha[d] they offered any proof that the vestiges of past discrimination have been eliminated."  ECF No. 194, p. 6.  The Eighth Circuit Court of Appeals affirmed that ruling.  *Davis v. Hot Springs Sch. Dist.*, 833 F.3d 959 (8th Cir. 2016).

All seven Districts now move for relief from the Settlement Agreement and seek to be declared unitary based on proffered evidence demonstrating the Districts' good-faith compliance with the Settlement Agreement and the elimination of the vestiges of past discrimination to the extent practicable.  ECF No. 208.  In support of the Motion, the Districts submitted affidavits from administrators from each of the seven Districts (collectively, the "Affidavits") with an attached monitoring report from the 2021-2022 ("21-22 Monitoring Report") school year relaying information and statistics from each of the seven Districts.[2]  ECF Nos. 208-1, 208-2, 208-3, 208-4, 208-5, 208-6, 208-7.  Plaintiffs responded in opposition to the Districts' motion, generally arguing that the Districts failed to demonstrate compliance and that further monitoring for compliance with the Settlement Agreement is necessary.  ECF No. 217.  The Districts replied, contending that Plaintiffs failed to provide any evidence to refute their compliance and reiterating that they have demonstrated their good faith compliance with the demands of the Settlement Order. The Court subsequently conducted a hearing on the instant motion.

---

[2] The Districts attached a copy of the Garland County Monitoring Report prepared by the Arkansas Division of Elementary and Secondary Education as "Exhibit 1" to each of the Affidavits attached in support of their Motion.  *See* ECF No. 209, n. 2.  The Court will refer to it as the "21-22 Monitoring Report" and will preserve the pagination of the document when citing to it.

## II.  STANDARD

"Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting Fed. R. Civ. P. 60(b)(5)).  "From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination."  *Bd. Of Educ. Of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 247 (1991).  The necessary transition away from segregated schools inherently recognizes that there may come a time when a school district's compliance with a desegregation decree would permit dissolution of that decree.  *See id.* at 248 (citation omitted); *and see Freeman v. Pitts*, 503 U.S. 467, 486 (1992) (noting that a district court's remedial control over a school district can eventually be withdrawn upon achievement of unitary status).  "[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes."  *Horne*, 557 U.S. at 453.  Courts may "relinquish continuing jurisdiction to ensure compliance with a desegregation consent decree when the moving party has demonstrated full compliance."  *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 572 (8th Cir. 2014).

A moving party "seeking relief from a desegregation plan adopted as a consent decree [or order] must show that it 'complied in good faith with the desegregation decree since it was entered' and that 'the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'"  *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 744 (8th Cir. 2011) (quoting *Freeman,* 503 U.S. at 492); *and see Dowell,* 498 U.S. 237 at 249-50.  In determining whether "the vestiges of past discrimination ha[ve] been eliminated to the extent practicable," a district court must "look not only at student assignments, but 'to every facet of school operations—faculty, staff, transportation,

extra-curricular activities and facilities.'" *Dowell,* 498 U.S. 237 at 249-50 (quoting *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 435 (1968)) (the "*Green* factors").

### III. DISCUSSION

The Districts argue that they have complied in good faith with the Settlement Agreement and that the "affidavits for each of the Districts attached to their motion show that they have met that standard [in *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738 (8th Cir. 2011)] and should be released from the Settlement Agreement's obligations." ECF No. 209, p. 43. The Districts set out the requirements of the Settlement Agreement in their motion and assert how each District has complied with each requirement. *Id.* at 5-34, 44-49; *see also* ECF Nos. 208-1, 208-2, 208-3, 208-4, 208-5, 208-6, 208-7, 208-8. Further, the Districts argue that they "have eliminated the vestiges of past discrimination to the extent practicable under the circumstances." ECF No. 209, p. 49.

The Districts explain that this analysis starts from the understanding that it is unclear what constitutional violation the Settlement Agreement was meant to remedy and that the Districts have lacked specificity from the start. They point out that when the Court initially approved the Settlement Agreement in 1991, it did not make a finding of illegal interdistrict segregation in the Garland County public schools. Not until two decades later did the Honorable Judge Hendren clarify and find that the Settlement Agreement served the "purpose of remedying the vestiges of prior de jure racial segregation within the public education system of that county." ECF No. 168, p. 5. However, the Districts assert that, even then, the Court did not identify specifically the vestiges to be remedied. ECF No. 209, p. 50. As such, "assessment of this factor is somewhat difficult because of the vague contours of the Settlement Agreement." *Id.* Yet, the Districts argue that despite the lack of specificity, they still demonstrate compliance with the *Green* factors. *See id.* at 34-42, 50-52; *see also* ECF Nos. 209-1, 209-2, 209-3, 209-4, 209-5, 209- 6, 209-7, 209-8.

Thus, the Districts argue that, because they have shown good faith compliance with the Settlement Agreement and have eliminated the vestiges of past discrimination to the extent practicable under the circumstances, they have reached unitary status and are entitled to relief from the Settlement Agreement.

In response, Plaintiffs argue that the Districts should not be relieved from the Settlement Agreement and dispute the facts supporting unitary status.  ECF No. 217, p. 3.  They first contend that the Districts are simply attempting to repackage their 2014 Motion for Relief (ECF No. 174).  In support of their response, Plaintiffs submitted the Affidavit of Marsalis Weatherspoon[3] (the "Weatherspoon Affidavit") "controverting the facts of unitary status" that the Districts assert in their supporting Affidavits.  ECF No. 217, p. 3; ECF No. 217-2.  The Weatherspoon Affidavit asserts that the Settlement Agreement needs to stay in place and that monitoring is still necessary.  Weatherspoon states that the "Arkansas legislature has just passed what is called the 'LEARNS Act' which is a complete overhaul of the education requirements in the state of Arkansas and monitoring is more important with the implementation of new law than at any other time in our history."  ECF No. 217-2, p. 4.  Plaintiffs additionally argue that "the goals of the Settlement Agreement are ongoing goals" that "require annual monitoring to ensure the goals are being met."  ECF No. 217, p. 4.

Plaintiffs also note several aspects of the Settlement Agreement that they believe the Districts have not complied with or satisfied.  Plaintiffs contend that the Districts inadequately address special education and gifted and talented programs.  *Id*.  Plaintiffs also assert that there is no evidence that supports that the staff of every School District has received necessary and

---

[3] Marsalis Weatherspoon is the President of the Hot Springs Branch of the N.A.A.C.P., Unit Number 6013, and is a successor Plaintiff to W.T. Davis, who at the time of filing the 1989 civil rights action was the President of the local Chapter of the Garland N.A.A.C.P.  ECF No. 217-2, p. 1.  Weatherspoon is also a Jessieville School District employee.  *Id.*

appropriate staff development. *Id.* at 5-6.  Further, they contend that "there is a lack of meaningful minority staff in the Districts of Cutter Morning Star, Jessieville School District, and Fountain Lake School District." *Id.* at 6.  As such, they argue this indicates a failure to meet the obligation in the Settlement Agreement that the "'the Department of Education agrees to provide the following staff training' which is contained on Page 6 . . . of the Settlement Agreement." *Id*. Plaintiffs then assert that there is no mention in the Districts' Motion for Relief that they have complied with the Settlement Agreement's requirement setting out that there should be a multicultural seminar designed to educate the staff about multicultural education philosophy. *Id.* Plaintiffs also register concern that textbooks and legislation are designed to eliminate "Critical Race Theory, thus requiring the need to continue under the Settlement Agreement, specifically under the provision of providing a specialist in the curriculum area to assist in selecting textbooks which reflect multicultural curriculum by the Districts." *Id.*  Plaintiffs further state that there is a complete lack of self-esteem curriculum for students who are at risk for school failure, which is addressed in the Settlement Agreement and needs to continue to be addressed. *Id.* at 6-7.  In sum, Plaintiffs argue that there is insufficient evidence to show compliance with the Settlement Agreement and that there still needs to be court monitoring and enforced compliance.

Plaintiffs also bring countermotions in their response.  They allege, without pointing to any evidence, that the "State Defendants' have threatened the various School Districts with a lack of accreditation if they are involved in a civil rights desegregation case."  ECF No. 217, p. 4.  As such, they "move that the Court order that the State Defendants not use coercion and duress on the School Districts or give any District a lack of accreditation because it is still involved in this litigation." *Id.* at 5.  They further "move by Counter Motion that all Defendants be required to adhere to the Settlement Agreement and the curriculum which it outlines." *Id.* at 7.  Plaintiffs also

"pray for their attorney fees, costs and expenses incurred in defending [the District]s' Motion for Relief from Settlement Agreement and previous motions that were made by some of the School Districts and appealed causing the Plaintiffs to incur expensive attorney fees and costs." *Id.* at p. 9.

In reply, the Districts argue that Plaintiffs' Response offers no basis for their opposition and point out that their "proof comes from a single affidavit that fails to contest the evidence offered in support of the motion." ECF No. 220, p. 1. They additionally assert that they are not trying to revisit their 2014 motion, as that "motion was based on changes in Arkansas law since the execution and approval of the Settlement Agreement." *Id.* at 2. The Districts contend that the instant motion is based on factual submissions showing compliance with the Settlement Agreement and assert that Plaintiffs have not refuted their evidence showing compliance. The Districts specifically dispute Plaintiffs' assertions regarding the lack of African American teachers and the lack of improvement in student demographic ratios, noting that the applicant pool is incredibly limited and that the overall diversity of each school district's student body has significantly increased in the last two decades. The Districts state that Plaintiffs "hope to subject the Districts to judicial supervision without end by holding them to vague requirements that appear nowhere in the Settlement Agreement." *Id*.

At the Hearing, the parties presented their arguments in connection with their motions. The Districts entered into evidence a more recent monitoring report relaying information and statistics from each of the seven Districts for the 2022-2023 school year (the "22-23 Monitoring Report"). Additionally, the following witnesses testified in support of the Districts' position to obtain relief from the Settlement Agreement and to be declared unitary: Nancy Anderson, superintendent of Cutter Morning Star School District; Stephen Campbell, director of instruction service and federal

programs coordinator for Fountain Lake School District; and Kendall Glomsky,[4] director of curriculum and instruction at Jessieville School District.[5]  During the hearing, Plaintiffs narrowed their arguments against dissolving the Settlement Agreement.  Plaintiffs now raise only two alleged shortcomings in the Districts' compliance with the Settlement Agreement: 1) the lack or low number of African American teachers within the school districts, and 2) the lack of improvement in the ratio of African American students within each school district.  Plaintiffs also suggested that the Settlement Agreement should continue in perpetuity to fulfill its purpose going forward.

The Court will first address the Districts' good faith compliance with the Settlement Agreement, followed by a discussion of the elimination of the vestiges of past discrimination to the extent practicable through examination of the *Green* factors.

### A.  Good Faith Compliance with the Settlement Agreement

Courts evaluate "school districts' objective compliance with the terms of their respective plans in the same fashion as [it] would evaluate compliance with the terms of any contract, simply by 'applying the terms of [the] contract between the parties to facts that have arisen since its creation.'"  *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 744-45 (8th Cir. 2011) (quoting *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 83 F.3d 1013, 1017 (8th Cir. 1996)).  "The 'good faith' aspect of compliance with a desegregation decree, however, is more specific than in contract law."  *Id.* at 745.  The Supreme Court of the United States, in *Freeman*, described this good-faith aspect as:

> whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the

---

[4] Melissa Speers, superintendent of Jessieville School District, who provided an affidavit in support of the Districts' Motion (ECF No. 208-4), was ill the day of the hearing so Ms. Glomsky provided her testimony on behalf of Jessieville School District.

[5] The Plaintiffs raised the most concerns with Cutter Morning Star School District, Fountain Lake School District, and Jessieville School District.  ECF No. 217, p. 6.

court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman,* 503 U.S. at 491.   The Court will now consider the Districts' evidence of good faith compliance with the terms of the Settlement Agreement and the parties' relevant arguments.

### 1.  Implementation of the School Choice Act of 1989

In the Settlement Agreement (ECF No. 208-8), the Districts and the State of Arkansas agreed to implement the School Choice Act of 1989, Ark. Code Ann. § 6-18-206 (repealed 2013). The Settlement Agreement states that the Districts "agree to implement or have already implemented as a show of good faith, Act 609 of the 1989 Regular Session of the Arkansas General Assembly, better known as the School Choice Act[6] . . . [to] facilitate the movement of students, both black and white, who desire to avail themselves of the diverse educational offerings offered by the respective school districts in Garland County."  ECF No. 208-8, p. 2.  The Districts provided the following evidence showing compliance with this aspect of the Settlement Agreement:

### i.  Cutter Morning Star School District

"The Monitoring Report shows that Cutter Morning Star enrolled 133 students participating in school choice in the 2019-20 school year, 150 such students in 2020-21, [] 154 such students in 2021-22 ,[and 185 such students in 2022-23.]"  ECF No. 209, p. 5; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.[7]

---

[6] "The Arkansas Public School Choice Act of 1989 makes clear that the Arkansas General Assembly's intent in passing the Arkansas Public School Choice Act of 1989 was to permit student transfer in order to provide choices for parents and students and to foster better school performance—as long as those transfers do not adversely affect the desegregation of either district."  *Teague ex rel. T.T. v. Arkansas Bd. of Educ.*, 873 F. Supp. 2d 1055, 1069 (W.D. Ark. 2012), *vacated sub nom. Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013).

[7] When referencing either Monitoring Report, the Court will cite to the native page number of the document and not the ECF page number.

### ii.  Fountain Lake School District

"The Monitoring Report shows that Fountain Lake enrolled 100 students participating in school choice in the 2019-20 school year, 92 such students in 2020-21, [] 81 such students in 2021-22[, and 84 such students in 2022-23.]"  ECF No. 209, p. 9; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

### iii.  Hot Springs School District

"The Monitoring Report shows that Hot Springs enrolled 170 students participating in school choice in the 2019-20 school year, 183 such students in 2020-21, [] 188 such students in 2021-22[, and 168 such students in 2022-23.]"  ECF No. 209, p. 13-14; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

### iv.  Jessieville School District

"The Monitoring Report shows that Jessieville enrolled 72 students participating in school choice in the 2019-20 school year, 66 such students in 2020-21, [] 75 such students in 2021-22[, and 77 such students in 2022-23.]"  ECF No. 209, p. 17-18; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

### v.  Lake Hamilton School District

"The Monitoring Report shows that Lake Hamilton enrolled 153 students participating in school choice in the 2019-20 school year, 167 such students in 2020-21, [] 195 such students in 2021-22[, and 200 such students in 2022-23.]"  ECF No. 209, p. 21-22; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

### vi.  Lakeside School District

"The Monitoring Report shows that Lakeside enrolled 501 students participating in school choice in the 2019-20 school year, 521 such students in 2020-21, [] 540 such students in 2021-22[,

and 538 such students in 2022-23.]"  ECF No. 209, p. 25-26; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

### vii.  Mountain Pine School District

"The Monitoring Report shows that Mountain Pine enrolled 57 students participating in school choice in the 2019-20 school year, 53 such students in 2020-21, [] 45 such students in 2021-22[, and 36 such students in 2022-23.]"  ECF No. 209, p. 29-30; 21-22 Monitoring Report, p. 4-6; 22-23 Monitoring Report, p. 7-8.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement.  The Districts have provided evidence demonstrating their compliance and Plaintiffs have neither contested their compliance nor offered any evidence disputing compliance.

### 2.  Garland County Education Consortium

In the Settlement Agreement, the Districts and the State of Arkansas agreed to create the Garland County Education Consortium.  *See* ECF No. 208-8, p. 3-4.  "Section III of the Settlement Agreement requires the Districts to organize the Garland County Education Consortium.  The Consortium discusses and examines, among other matters as may be agreed to by its members, the following issues as set forth in Section III, 1-7, of the Settlement Agreement: (1) enrollment fluctuations; (2) student ratio; (3) compliance with the Arkansas Standards for Accreditation; (4) consolidation; (5) joint and bulk purchasing; (6) sharing of programs and personnel; and (7) hiring of minority teachers and staff."  21-22 Monitoring Report, p. 3; *see* ECF No. 208-8, p. 3-4.  All Affidavits at ¶ 15 refer to the 21-22 Monitoring Report at pages 6, 108-11, and 146-48.  Page 6 references the obligations under the Settlement Agreement, pages 108-111 are titled "Attachment IV: Garland County Consortium Agenda" and show the agenda from the Annual Garland County Public Schools Desegregation Meeting, and pages 146-148 are titled "Attachment XI: Available

Labor Pool of Certified Staff Notice" and show an email from the Equity Assistance Center to the Districts regarding "the composition of the available labor pool for black teachers and staff for Garland County."

The Districts provided the following evidence showing compliance with this aspect of the Settlement Agreement:

### i. Cutter Morning Star School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Cutter Morning Star." ECF No. 209, p. 5-6; *see also* 22-23 Monitoring Report, p. 104-107. Nancy Anderson attended on behalf of Cutter Morning Star. 21-22 Monitoring Report, p. 109.

### ii. Fountain Lake School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Fountain Lake." ECF No. 209, p. 10; *see also* 22-23 Monitoring Report, p. 104-107. At the Hearing, Stephen Campbell testified that he attended the last meeting on behalf of Fountain Lake.

### iii. Hot Springs School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Hot Springs." ECF No. 209, p. 14; *see also* 22-23 Monitoring Report, p. 104-107. Stephanie Nehus attended on behalf of Hot Springs. 21-22 Monitoring Report, p. 109.

### iv. Jessieville School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Jessieville." ECF No. 209, p. 18;

*see also* 22-23 Monitoring Report, p. 104-107.  Melissa Speers attended on behalf of Jessieville. 21-22 Monitoring Report, p. 109.

### v.  Lake Hamilton School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Lake Hamilton."  ECF No. 209, p. 22; *see also* 22-23 Monitoring Report, p. 104-107.  Shawn Higginbotham attended on behalf of Lake Hamilton.  21-22 Monitoring Report, p. 109.

### vi.  Lakeside School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Lakeside."  ECF No. 209, p. 26; *see also* 22-23 Monitoring Report, p. 104-107.  Shawn Cook and Jamie Preston attended on behalf of Lakeside.  21-22 Monitoring Report, p. 109.

### vii.  Mountain Pine School District

"The [21-22] Monitoring Report includes an agenda from the 2022 annual meeting of the Consortium, which shows the attendance and participation of Mountain Pine."  ECF No. 209, p. 30.  Bobby Applegate and Lamont Page attended on behalf of Mountain Pine.  21-22 Monitoring Report, p. 109.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement.  The Districts have provided evidence demonstrating their compliance and Plaintiffs have neither contested their compliance nor offered any evidence disputing compliance.

### 3.  Staff Development

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to provide staff development training programs.  "Pursuant to Section IV-A of the Settlement

Agreement, the DESE and the Districts agree to ensure that staff receives necessary and appropriate development through various programs to aid staff in providing a quality, desegregated education for all students."[8]  21-22 Monitoring Report, p. 3; *see* ECF No. 208-8, p. 5-6.  The DESE agrees to provide the following staff training programs: (1) Teacher Assistance Team Training; (2) Civil Rights Awareness Training; (3) Race Relations Seminar; and (4) Multicultural Counseling Strategies.  ECF No. 208-8, p. 5-6.  All Affidavits at ¶ 16 refer to the 21-22 Monitoring Report at page 7 to show compliance with this requirement of the Settlement Agreement.  Page 7 states: "The Arkansas DESE continues to make available upon request professional development periodically to new staff members of the Districts in the areas of teacher assistance team training, civil rights awareness training, race relations seminar, and multicultural counseling strategies." Each Affidavit essentially regurgitates this language.

The Districts highlight the multitude of staff development programs undertaken by each school district, which are documented[9] within the Monitoring Reports as follows:

    i. **Cutter Morning Star School District**

- 21-22 Monitoring Report, p. 24; 22-23 Monitoring Report, p. 21.

    ii. **Fountain Lake School District**

- 21-22 Monitoring Report, p. 31; 22-23 Monitoring Report, p. 28.

    iii. **Hot Springs School District**

- 21-22 Monitoring Report, p. 37; 22-23 Monitoring Report, p. 34.

    iv. **Jessieville School District**

- 21-22 Monitoring Report, p. 45; 22-23 Monitoring Report, p. 42.

---

[8] "DESE" refers to the Arkansas Division of Elementary and Secondary Education.  21-22 Monitoring Report, p. 2.
[9] For certain information and data relevant to compliance with terms of the Settlement Agreement that is extensive, the Court will simply cite to where within the Monitoring Reports that the information is found rather than attempt to recreate that information within this Order.

> **v.  Lake Hamilton School District**
>
>> • 21-22 Monitoring Report, p. 51; 22-23 Monitoring Report, p. 49.
>
> **vi.  Lakeside School District**
>
>> • 21-22 Monitoring Report, p. 58; 22-23 Monitoring Report, p. 56
>
> **vii.  Mountain Pine School District**
>
>> • 21-22 Monitoring Report, p. 65-66; 22-23 Monitoring Report, p. 64.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement. As noted above, the Districts have provided evidence demonstrating their compliance by cataloguing the staff development programs utilized by the various school districts. Though Plaintiffs abandoned their opposition to the District's compliance with this requirement during the hearing, the evidence provided by the Districts is sufficient to overcome the unsupported assertions Plaintiffs initially made in their response to the instant motion.

### 4.  Curriculum

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to provide curriculum development. "Pursuant to Section IV-B of the Settlement Agreement, the DESE and the Districts agree to provide and engage in [the following] curriculum development:" (1) Multicultural Education Seminar; (2) Textbook and Instructional Material Selection Assistance; and (3) Self-Esteem Curriculum. 21-22 Monitoring Report, p. 3; *see* ECF No. 208-8, p. 7. The Districts first present the broader initiatives in which each District now engages. 21-22 Monitoring Report, p. 11-13; 22-23 Monitoring Report, p. 12-14. The Districts also provide information regarding the recently added curriculum offerings for each school district within the Monitoring Reports as follows:

      **i.   Cutter Morning Star School District**

- 21-22 Monitoring Report, p. 24-25; 22-23 Monitoring Report, p. 21.

     **ii.   Fountain Lake School District**

- 21-22 Monitoring Report, p. 31; 22-23 Monitoring Report, p. 28.

   **iii.   Hot Springs School District**

- 21-22 Monitoring Report, p. 38-39; 22-23 Monitoring Report, p. 34-35.

   **iv.   Jessieville School District**

- 21-22 Monitoring Report, p. 46-46; 22-23 Monitoring Report, p. 43.

     **v.   Lake Hamilton School District**

- 21-22 Monitoring Report, p. 51; 22-23 Monitoring Report, p. 49.

    **vi.   Lakeside School District**

- 21-22 Monitoring Report, p. 58-59; 22-23 Monitoring Report, p. 57.

   **vii.   Mountain Pine School District**

- 21-22 Monitoring Report, p. 66-68; 22-23 Monitoring Report, p. 64-65.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement. The Districts provide evidence demonstrating their adherence, and Plaintiffs have not presented any evidence to the contrary.

### 5. Testing and Assessment

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to monitor testing and assessment. "Pursuant to Section IV-C of the Settlement Agreement, the DESE and the Districts agree to collect and analyze student test score data to improve awareness and address the achievement gaps between the test scores of African American students and White students." 21-22 Monitoring Report, p. 3; *see* ECF No. 208-8, p. 8. The DESE agrees to provide the following assistance: (1) Testing and Assessment for Multicultural Schools; (2) The Diagnostic Use of EPSF Survey; and (3) Assessment of Diagnosis. ECF No. 208-8, p. 8.

All Affidavits at ¶ 18 include the following language: the Districts "implemented staff training programs that teach educators how to measure and analyze students' academic achievement in a non-discriminatory, unbiased manner. The training program covers topics such as the use of objective assessment tools, avoiding bias in grading and evaluation, and identifying and addressing achievement gaps. The training has been provided to all staff members involved in assessing student performance, including teachers, counselors, and administrators." The Districts provided student test score data for ACT Aspire Achievement testing from the 2017-18 school year to the 2022-23 school year.[10] *See* 21-22 Monitoring Report, p. 115-118; 22-23 Monitoring Report, p. 110-113. The Districts also provided the information regarding student "Alternative Learning Environment Enrollment" for each school district within the Monitoring Reports as follows:

### i. Cutter Morning Star School District

- 21-22 Monitoring Report, p. 24-25; 22-23 Monitoring Report, p. 21-22.

---

[10] "Arkansas statewide ACT Aspire testing was cancelled for the 2019-2020 school year due to COVID-19." 22-23 Monitoring Report, p. 111.

ii. **Fountain Lake School District**

- 21-22 Monitoring Report, p. 31; 22-23 Monitoring Report, p. 28-29.

iii. **Hot Springs School District**

- 21-22 Monitoring Report, p. 39; 22-23 Monitoring Report, p. 35-36.

iv. **Jessieville School District**

- 21-22 Monitoring Report, p. 46; 22-23 Monitoring Report, p. 43.

v. **Lake Hamilton School District**

- 21-22 Monitoring Report, p. 52; 22-23 Monitoring Report, p. 50.

vi. **Lakeside School District**

- 21-22 Monitoring Report, p. 59; 22-23 Monitoring Report, p. 58.

vii. **Mountain Pine School District**

- 21-22 Monitoring Report, p. 68; 22-23 Monitoring Report, p. 65.

The Court is satisfied that the Districts have complied with this component of the Settlement Agreement. The Districts provide evidence of their compliance, and Plaintiffs have not disputed the Districts' compliance or presented evidence to the contrary.

6. **Special Education and Gifted and Talented**

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to provide Special Education and Gifted and Talented Education Programs. "Pursuant to Section IV-D of the Settlement Agreement, the DESE and the Districts agree to determine and address through data the over-identification of minority students in special education and the under-identification of minority students in Gifted and Talented programs." 21-22 Monitoring Report, p. 3-4; *see* ECF

No. 208-8, p. 9.  The 21-22 Monitoring report "provides the enrollment of students in special education programs (students served under the Individuals with Disabilities Education Act [IDEA]), Section 504 programs (students served under Section 504 of the Rehabilitation Act of 1973), and Gifted and Talented programs for the most recent three years. This report provides information on performance in special education against state targets (e.g., disproportionality) outlined in the Special Education State Performance Plan (SPP)."  21-22 Monitoring Report, p. 4.

The Districts provide statistical information regarding the racial makeup of students participating in Gifted and Talented Services, Special Education Services, Section 504 Services, and Dyslexia Therapy Services in each school district, which is found in the Monitoring Reports as follows:

    i.  **Cutter Morning Star School District**

- 21-22 Monitoring Report, p. 25-27; 22-23 Monitoring Report, p. 22-24.

    ii.  **Fountain Lake School District**

- 21-22 Monitoring Report, p. 32-33; 22-23 Monitoring Report, p. 29-31.

    iii.  **Hot Springs School District**

- 21-22 Monitoring Report, p. 32-33; 22-23 Monitoring Report, p. 36-38.

    iv.  **Jessieville School District**

- 21-22 Monitoring Report, p. 46-48; 22-23 Monitoring Report, p. 43-45.

     **v.   Lake Hamilton School District**

- 21-22 Monitoring Report, p. 52-54; 22-23 Monitoring Report, p. 50-52.

    **vi.   Lakeside School District**

- 21-22 Monitoring Report, p. 59-61; 22-23 Monitoring Report, p. 58-60.

    **vii.   Mountain Pine School District**

- 21-22 Monitoring Report, p. 69-70; 22-23 Monitoring Report, p. 65-67.

The Court is satisfied that the Districts have complied with this requirement of the Settlement Agreement. The Districts provide detailed evidence of their tracking of students within various special education programs or gifted and talented programs. Though Plaintiffs abandoned their opposition to the Districts' compliance with this requirement during the hearing, Plaintiffs' initial arguments never provided evidence to support their assertions regarding the Districts' alleged failure to adhere to this facet of the Settlement Agreement.

    **7.   Student/Teacher Interaction Programs**

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to provide Student/Teacher Interaction Programs. "Pursuant to Section IV-E of the Settlement Agreement, the DESE and the Districts agree to monitor and implement [the following] programs that aim at improving student and teacher relationships and ensuring positive day-to-day interactions between students and teachers:" (1) Teacher Expectations for Student Achievement; (2) Effective Schools Management; (3) Parental Involvement; (4) Classroom Management; (5)

Establishing a School Volunteer Program; (6) Cooperative Learning; and (7) The Provision of Equity.  21-22 Monitoring Report, p. 4; *see* ECF No. 208-8, p. 10-11.

All Affidavits at ¶ 20 include the following language: "[The Districts have] implemented programs for teachers and administrators to improve student achievement, effective school management, and parental involvement. These programs include training on classroom management, establishing a school volunteer program, and cooperative learning. [The Districts have] also provided assistance with self-evaluation and compliance plans to ensure that all programs are effective and aligned with the goal of ending discrimination."  Further, each Affidavit at ¶ 20 refers to the 21-22 Monitoring Report at pages 8-18 to show compliance with this requirement of the Settlement Agreement.  Some of the Affidavits then point to specific data comparing student and teacher demographics for a particular school district.  The Districts provided this statistical information for each school district, which is found in the Monitoring Reports as follows:

   i.  **Cutter Morning Star School District**

- 21-22 Monitoring Report, p. 24; 22-23 Monitoring Report, p. 21.

  ii.  **Fountain Lake School District**

- 21-22 Monitoring Report, p. 31; 22-23 Monitoring Report, p. 37.

 iii.  **Hot Springs School District**

- 21-22 Monitoring Report, p. 37; 22-23 Monitoring Report, p. 34.

 iv.  **Jessieville School District**

- 21-22 Monitoring Report, p. 45; 22-23 Monitoring Report, p. 42.

  v.  **Lake Hamilton School District**

- 21-22 Monitoring Report, p. 51; 22-23 Monitoring Report, p. 49.

### vi.  Lakeside School District

- 21-22 Monitoring Report, p. 58; 22-23 Monitoring Report, p. 56.

### vii.  Mountain Pine School District

- 21-22 Monitoring Report, p. 65; 22-23 Monitoring Report, p. 64.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement.  The Districts provide detailed evidence of their adherence, and Plaintiffs have provided neither a distinct argument in opposition nor evidence to support any opposition.

### 8.  Attendance at the Annual Institute for Special Education Law

Further, pursuant to Section IV-F of the Settlement Agreement, "the DESE agrees to fund the attendance of one representative, selected by the Consortium, to the Annual Institute for Special Education Law."  ECF No. 208-8, p. 11-12.  All Affidavits at ¶ 21 include the following language: "With respect to one school representative attending the Annual Institute for Special Education Law, according to the [Monitoring Report], the DESE continues to offer funding for at least one representative to attend the Annual Institute for Special Education Law each year on an ongoing basis."  Further, each Affidavit at ¶ 21 refers to page 7 of the Monitoring Report to show compliance with this requirement of the Settlement Agreement.  Page 7 of the Monitoring Report provides: "[T]he Arkansas DESE Special Education Unit continues to offer funding for the Garland County Education Consortium to send one selected representative to the Annual Law Review Publications' (LRP) National Institute on Legal Issues for Educating Individuals with Disabilities.  For the 2021-2022 academic year, the Consortium selected Suzanne Walls, Jessieville School District Special Education Supervisor, as the representative to attend the institute."  Page 10 of the 22-23 Monitoring Report provides: "For the 2022-2023 academic year, the Consortium

selected Haley Hatch, Lake Hamilton School District Director of Special Services as the representative to attend the institute."

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement. The Districts provide evidence of their compliance, and Plaintiffs do not dispute their compliance or offer evidence to the contrary.

### 9. Grants

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to assist in applying for various grant programs. "Pursuant to Section IV-F of the Settlement Agreement, the DESE upon request provides assistance in applying for and securing the following grants: Drug-Free Schools and Communities, Effective Schools, Math and Science, Classroom Management, Alternative School, and Middle-Level School." 21-22 Monitoring Report, p. 3; *see* ECF No. 208-8, p. 12. All Affidavits at ¶ 22 include the following language: the Districts have "applied for and received various grant programs and the DESE provides assistance upon request." Further, each Affidavit at ¶ 22 refers to page 4 of the 21-22 Monitoring Report to show compliance with this requirement of the Settlement Agreement. Each Affidavit at ¶ 22 then points to specific grants awarded to its District. Page 4 of the 21-22 Monitoring Report restates the obligations of the Districts under this section of the Settlement Agreement.

The Districts also provided detailed information regarding the specific grants each school district applied for and received for the 2021-2022 and 2022-2023 school years, which is found within the Monitoring Reports as follows:

### i. Cutter Morning Star School District

- 21-22 Monitoring Report, p. 27; 22-23 Monitoring Report, p. 24.

ii. **Fountain Lake School District**

- 21-22 Monitoring Report, p. 33-34; 22-23 Monitoring Report, p. 31.

iii. **Hot Springs School District**

- 21-22 Monitoring Report, p. 41-42; 22-23 Monitoring Report, p. 38-39.

iv. **Jessieville School District**

- 21-22 Monitoring Report, p. 48; 22-23 Monitoring Report, p. 45.

v. **Lake Hamilton School District**

- 21-22 Monitoring Report, p. 54; 22-23 Monitoring Report, p. 52.

vi. **Lakeside School District**

- 21-22 Monitoring Report, p. 61; 22-23 Monitoring Report, p. 60-61.

vii. **Mountain Pine School District**

- 21-22 Monitoring Report, p. 70; 22-23 Monitoring Report, p. 76.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement. The Districts provide detailed evidence of their compliance, and Plaintiffs have neither disputed their compliance nor provided evidence to the contrary.

**10. DESE Monitoring**

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to submit to monitoring by the DESE. Pursuant to Section IV-G of the Settlement Agreement, the DESE "agrees to provide equity monitoring in compliance with Standard 15 of the Arkansas Educational Standards in order to determine if the districts are providing a quality, desegregated

education to all of the students." ECF No. 208-8, p. 12-13. All Affidavits at ¶ 23 include the following language: the Districts "implemented systems for data collection and reporting, and is committed to working collaboratively with the DESE to ensure compliance with desegregation requirements." Further, each Affidavit at ¶ 23 refers to the 21-22 Monitoring Report to show compliance with this requirement of the Settlement Agreement. The 21-22 Monitoring Report provides as follows:

> The monitoring process consisted of a collection and review of information from a variety of data sources. This included:
> • Virtual focus interviews with each District Special Education Coordinator, District Section 504 Coordinator, and District Gifted and Talented Coordinator.
> • An examination of District self-collected classroom observation data applying an equitable classroom practices observation tool.
> • An examination of submitted evidence from each District regarding their compliance with the Settlement Agreement.
> • An examination of data gathered within the Statewide Information System (SIS). SIS is a web-based system developed by the Arkansas Department of Education's Research and Technology Division to enable Arkansas school systems to submit and certify data to the State. The completeness of the SIS data included in this report is reliant upon the most recent information available by the development of this report and each school districts' submission utilizing eSchoolPlus software.

21-22 Monitoring Report, p. 2-3. The 22-23 Monitoring Report also provides as follows:

> The monitoring process consisted of a collection and review of information from a variety of data sources. This included:
> • Focus on interviews with each District Special Education Coordinator, District Section 504 Coordinator, and District Gifted and Talented Coordinator.
> • An examination of District self-collected classroom observation data applying an equitable classroom practices observation tool.
> • An examination of submitted evidence from each District regarding their compliance with the Settlement Agreement.
> • An examination of data gathered within the Statewide Information System (SIS). SIS is a web-based system developed by the Arkansas Department of Education's Research and Technology Division to enable Arkansas school systems to submit and certify data to the State. The completeness of the SIS data included in this report is reliant upon the most recent information available by the development of this report and each school districts' submission utilizing eSchoolPlus software.

22-23 Monitoring Report, p. 3-4.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement.  The Districts' compliance is inherent in the DESE-compiled Monitoring Reports provided to the Court in support of their motion.  Plaintiff does not dispute this compliance.

### 11. Annual Consortium Meeting with DESE Representative

In the Settlement Agreement, the Districts and the State of Arkansas further agreed to participate in an annual meeting with a DESE representative and the Garland County Education Consortium.  Pursuant to Section IV-H of the Settlement Agreement, the DESE "agrees to send a designated representative to at least one (1) meeting annually of the Garland County Education Consortium."  ECF No. 208-8, p. 13.  All Affidavits at ¶ 24 include the following language: the Districts "ensured that the Garland County Education Consortium and a designated DESE representative meet annually to discuss enrollment, attendance and black/white ratios in Garland County schools. This meeting has promoted ongoing communication and collaboration between the [Districts] and the DESE and has identified areas for improvement related to equity and inclusion in [each of the Districts]."  Further, each Affidavit at ¶ 24 refers to the 21-22 Monitoring Report to show compliance with the requirement of the Settlement Agreement.  Page 6 of that Monitoring Report simply references the obligations under the Settlement Agreement.  Pages 108-111 of that Monitoring Report show "Attachment IV: Garland County Consortium Agenda," with provides the agenda from the Annual Garland County Public Schools Desegregation Meeting and the representatives from each school district in attendance.  The 22-23 Monitoring Report proves a similar "Attachment IV: Garland County Consortium Agenda," but does not provide the specific representative attendees for each school district.  22-23 Monitoring Report, p. 104-107.

The Court is satisfied that the Districts have complied with this aspect of the Settlement Agreement. The Districts provide evidence of their attendance and the relevant meetings, and Plaintiffs do not dispute compliance.

Accordingly, upon review of the parties' briefings, their testimony at the hearing on this matter, and the information provided regarding each aspect of the Settlement Agreement, the Court finds that the Districts have demonstrated a "good-faith commitment to the whole of the [C]ourt's decree" and commitment to addressing the issues necessitating the promulgation of the Settlement Agreement. The Districts have complied with all aspects of the Settlement agreement, and the Court may now proceed to evaluating whether the "vestiges" of past discrimination have been eliminated to the extent practicable.

### B. Compliance with the *Green* Factors

The *Green* factors required for analyzing whether the "vestiges of past discrimination" have subsided to the extent practicable are: 1) student assignments, 2) transportation, 3) staff and faculty assignments, 4) facilities, and 5) extracurricular activities. *Dowell*, 498 U.S. 237 at 249-50 (citing *Green*, 391 U.S. at 435). "As the *de jure* violation becomes more remote in time and . . . demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Freeman*, 503 U.S. at 496.

### 1. Student Assignment

The Districts provide statistical information regarding the demographics of enrolled students for recent school years and the demographic ratios between the students and their teachers. The Districts present this data for each school district within the Monitoring Reports as follows:

    **i.   Cutter Morning Star School District**

- 21-22 Monitoring Report, p. 23-24; 22-23 Monitoring Report, p. 20-21.

    **ii.   Fountain Lake School District**

- 21-22 Monitoring Report, p. 30-31; 22-23 Monitoring Report, p. 27-28.

    **iii.   Hot Springs School District**

- 21-22 Monitoring Report, p. 36-37; 22-23 Monitoring Report, p. 33-34.

    **iv.   Jessieville School District**

- 21-22 Monitoring Report, p. 44-45; 22-23 Monitoring Report, p. 41-42.

    **v.   Lake Hamilton School District**

- 21-22 Monitoring Report, p. 50-51; 22-23 Monitoring Report, p. 48-49.

    **vi.   Lakeside School District**

- 21-22 Monitoring Report, p. 57-58; 22-23 Monitoring Report, p. 55-56.

    **vii.   Mountain Pine School District**

- 21-22 Monitoring Report, p. 64-65; 22-23 Monitoring Report, p. 63-64.

The Districts also provide data on the demographic makeup of students enrolled in Algebra I, which is a "'gatekeeper course' because it is generally considered a prerequisite for higher-level mathematics courses."  21-22 Monitoring Report, p. 18-21.

Plaintiffs contend that this factor weighs against ending oversight because the proportion of African American students in each school district has not improved significantly over time. The Districts counter that the overall racial diversity of each school district has increased significantly from the 2004-05 school year to the 2022-23 school year, which indicates that there is no lingering or ongoing discrimination by any school district.  The Court agrees, as that increased diversity is clear in the statistical documentation provided by the Districts.  *See* ECF No. 220, p. 7-8.  The data shows that each school district has had relatively little change in the percentage of enrolled African American students, with no increase or decrease exceeding seven percent. However, there have been increases in Hispanic students and students of "2 or more races" in every school district.  Further, the racial group that has decreased most significantly as a percentage of the student body in each school district is white students.  This overall increase in diversity, coupled with the Districts' efforts undertaken in compliance with the Settlement Agreement detailed above, prevents the Court from concluding that the mostly static ratio of African America students signals ongoing discrimination or the "vestiges of past discrimination."  Accordingly, the Court is satisfied that this factor weighs in favor of dissolving the consent decree's supervision of the Districts.

### 2.  Transportation

All Affidavits assert that the Districts have implemented transportation policies that "promote equitable access to schools for all students, including the provision of free or low-cost transportation for students who may not have access to reliable transportation, the equitable distribution of bus routes and stops, and the development of transportation plans that prioritize the

needs of historically marginalized communities." Affidavits, ¶ 27.  The Districts also provide the attendance rates among different demographics of students in each school district because "[s]chool district transportation services are a component of student attendance rates."  21-22 Monitoring Report, p. 21-22; 22-23 Monitoring Report, p. 19.

First, the Court notes that it cannot locate any asserted shortcomings in the record regarding past discrimination in the Districts' transportation policies, either general or particularized.  Also, the attendance rates presented by the Districts do not indicate that there is any discernibly significant disparity in attendance rates among different student demographics that would result from inequitable transportation policies.  Further, Plaintiffs have not argued that the Districts' transportation policies are discriminatory or are negatively impacted by past discrimination.  Thus, the Court is satisfied that this factor weighs in favor of ending oversight.

### 3.  Faculty and Staff Assignment

All affidavits assert that the Districts have "implemented policies and programs that promote diversity, equity, and inclusion among faculty and staff, including the recruitment and retention of a diverse workforce, ongoing professional development on issues of equity and inclusion, and implementation of anti-bias training programs for all staff."  Affidavits, ¶ 29.  The Districts provide data on the professional development hours undertaken by staff at each school district.  21-22 Monitoring Report, p. 15; 22-23 Monitoring Report, p. 16.  The Districts also provide data on the degrees obtained by teachers in each school district, the teachers' salaries, their average years of teaching experience, their certification status, and their use of various leave days.  21-22 Monitoring Report, p. 16-17; 22-23 Monitoring Report, p. 17-18.  Each District's plan for recruiting minority teachers and staff is included in the Monitoring Reports.  21-22 Monitoring Report, p. 149-178; 22-23 Monitoring Report, p. 134-181.  Further, as the Court noted above, the

Districts provided information regarding the demographic ratios between students and teachers in each school district.  *See* Section III.A.7.

Plaintiffs argue that the low amount or complete absence of African American teachers in certain school districts indicates that past discrimination has not been sufficiently rectified. However, the Districts provided testimony at the hearing from staff members of those school districts outlining the various and continuing efforts made to increase the diversity of its teachers and staff, which include recruitment outreach to various colleges in Arkansas.  The staff also testified regarding the extremely limited number of applications they have received despite their efforts.  Plaintiffs do not offer evidence disputing the steps the Districts have undertaken to increase their staff diversity or presented alternative procedures that would have created greater success at attracting minority applicants.  Between the data provided in the Monitoring Reports and the testimony offered at the hearing, the Court finds that the Districts have taken reasonably practicable steps to increase the diversity of their staff and that the low number of African American staff is a result of circumstance and not discrimination.  Thus, the Court is satisfied that this factor supports dissolution of oversight.

### 4.  Facilities

The DESE Monitoring Reports outline the aims of the Districts in protecting against discrimination within facility operation: "Facilities GOAL: School districts shall ensure that decisions regarding the selection of school building sites, planning of new facilities and renovations, and closings of school facilities do not limit accessibility to students and do not limit desegregation of the local school district."  21-22 Monitoring Report, p. 10; 22-23 Monitoring Report, p. 12.  The Monitoring Reports continue with the conclusion that there is "[n]o evidence of decisions made by the school districts in Garland County regarding the selection and planning

of new school building sites, renovations, or closings that limit accessibility to students or limit desegregation of the local school districts." 21-22 Monitoring Report, p. 10; 22-23 Monitoring Report, p. 12.

Plaintiff does not argue that the Districts engage in discriminatory policies or practices with regard to their facilities operation. The Monitoring Reports state that there is no evidence of discrimination in how the Districts manage or operate facilities. Also, no party has pointed to documentation in the record of any current of past examples of discrimination related to facilities. Thus, the Court is satisfied that this factor supports dissolution of oversight.

### 5. Extracurricular Activities

The DESE Monitoring Reports outline the aims of the Districts in protecting against discrimination regarding extracurricular activities: "Student Activities GOAL: Districts shall ensure that no student is denied equitable access to participate in student activities." 21-22 Monitoring Report, p. 18; 22-23 Monitoring Report, p. 18-19. The Monitoring Reports continue with the conclusion that "[n]o evidence is shown of students being denied fair access to participate in student activities in school districts in Garland County." 21-22 Monitoring Report, p. 18; 22-23 Monitoring Report, p. 18-19.

Plaintiffs do not argue that the Districts engage in discriminatory practices regarding students' extracurricular activities or that the extracurricular offerings are warped by past discrimination. The Monitoring Reports found that there is no evidence of discrimination within the extracurricular programs offered to students. No party has cited specific information in the record detailing discrimination related to extracurricular activities. Thus, the Court is satisfied that this factor supports dissolution of oversight.

Upon reviewing the information provided above relevant to each of the *Green* factors and noting the Districts' compliance with all aspects of the consent decree's obligations, the Court finds that the Districts have sufficiently shown that they have obtained full good faith compliance with the Settlement Agreement and that "the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Dowell*, 498 U.S. at 250.  Accordingly, the Districts' compliance permits the Court to declare the Districts unitary and relinquish its continuing jurisdiction to oversee compliance with the Settlement Agreement.

## IV.  CONCLUSION

For the reasons stated above, the Court finds that the Districts' Motion for Relief from Settlement Agreement (ECF No. 208) should be and hereby is **GRANTED**.  The Districts are hereby declared to be unitary and this case is hereby **DISMISSED WITH PREJUDICE** as to all parties and claims.

**IT IS SO ORDERED**, this 23rd day of September, 2024.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge